UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARY BYRD, et al.,

                    Plaintiffs,

      -against-                             MEMORANDUM OPINION
                                            AND ORDER

GLEN S. GOORD, Commissioner, New York State           00 Civ. 2135 (GBD)
Department of Correctional Services, in his official
capacity, ELIOT L. SPITZER, Attorney General,
New York State, in his official capacity,
H. CARL McCALL, Comptroller, State of New York,
in his official capacity, MCI WORLDCOM, INC.,
a Georgia Corporation, and
MCI TELECOMMUNICATIONS CORPORATION,
a Delaware Company,
                             Defendants.
-------------------------------------------------------------X
GEORGE B. DANIELS, District Judge:

      Recipients of collect telephone calls made by state prison inmates bring suit against the

New York State Department of Corrections, state officials ("state defendants") and the telephone

companies ("MCI") alleging that the exorbitant rates plaintiffs are charged, the exclusive

services contract between the state and the telephone companies, and its collect-call-only aspect

violate their constitutional rights. Defendants move to dismiss pursuant to Fed. R. Civ. P.

12(b)(6). State defendants' motion to dismiss plaintiffs' challenge to the exclusive services

contract is granted. State defendants' motion to dismiss plaintiffs' challenge to the collect-call-

only aspect of the contract is also granted. State defendants' motion to dismiss plaintiffs'

constitutional challenge to the imposition of a sixty percent state commission charge is denied.

Defendant MCI's motion to dismiss is granted in its entirety.

**INTRODUCTION**

Plaintiffs, a group consisting of family members, legal counsel and others who receive

collect phone calls from prison inmates, allege that the exclusive services contract between the

New York State Department of Corrections ("DOCS") and MCI Worldcom, Inc. and its

subsidiary MCI Telecommunications Corporation (collectively, "MCI")[1] resulted in excessively

high telephone rates to the recipients of inmate collect calls.[2] Under this contract, DOCS granted

to MCI the exclusive right to provide telephone services to all of its prison facilities. Neither

inmates nor the recipients of their calls are permitted to use other telephone providers or other

billing methods. On October 30, 1995 DOCS circulated its Request for Proposals which

"required a minimum commission of at least forty-seven percent of the gross revenues" to be

returned to the state. Compl. ¶ 28. In its successful bid, MCI guaranteed DOCS a commission of

sixty percent of the gross revenues from accepted and completed telephone calls, in addition to a

"significant bonus" that is "over and above the cost of administration and operation of the

telephone system."[3] Compl. ¶¶ 28-29. The telephone system restricts inmates to making collect

calls to persons on a pre-approved list. Inmates cannot receive telephone calls from outside the

---

[1] On May 1, 2000 MCI Worldcom, inc. changed its name to Worldcom, Inc. and on May 7, 1999, MCI Telecommunications Corp. was renamed MCI Worldcom Network Services, Inc. Plaintiffs filed their amended complaint on May 22, 2000. On July 26, 2002, defendant MCI Worldcom, Inc. filed a notice of bankruptcy, which automatically stayed these proceedings. The stay was lifted once notice was received that defendant MCI had emerged from bankruptcy.

[2] The exclusive services contract arose from a public 'request for proposal' distributed by DOCS in 1995 seeking providers for their prison telephone system.

[3] The gross revenue accumulated from this system in Fiscal Years 1996-1999 exceeded $155 million. Over $93 million, or approximately sixty percent, was paid by MCI as a commission back to DOCS.

facility.

Plaintiffs challenge these three aspects of the telephone system: MCI's position as the sole provider of all telephone services to DOCS; the fact that the system allows inmates to make only collect calls; and the sixty percent commission guaranteed and paid by MCI to DOCS. Specifically, plaintiffs assert violations of: (1) their equal protection and due process rights under the Fourteenth Amendment; (2) their right to freedom of association under the First Amendment; (3) their right to Contract under the First Amendment, antitrust violations under the Sherman Act and the Donnelly Act; and a common law claim for tortious interference with contract.

Plaintiffs allege that each collect call made by an inmate is assessed a surcharge that is approximately sixty percent greater than the normal connection fee charged for exactly the same service for regular non-inmate collect calls, allowing MCI to pass onto plaintiffs the cost of the guaranteed sixty percent commission. Plaintiffs contend that this surcharge violates their due process and equal protection rights under the Fourteenth Amendment.[4] Plaintiffs also challenge the collect-call-only aspect of the telephone system, arguing that the ensuing high cost of the collect calls restricts plaintiffs' ability to communicate with their family members in prison in violation of their First Amendment right to freedom of speech and association. Lastly, plaintiffs argue that the exclusive services contract prevents them from contracting with a telephone

---

[4] Plaintiffs allege that "the typical station-to-station connection toll for a collect call from Ulster County to New York City is $1.80. On the other hand, for each station-to-station collect call by inmates from NYSDOCS's Eastern Correctional Facility in Ulster County to New York City, Defendant MCI charges a $3.00 toll . . . . which is 60 percent higher than the standard connection fee . . . ." Compl. ¶ 36. It is uncontested that state and federal regulatory agencies approved all of the rates charged by MCI. MCI filed all intrastate surcharges and per minute rates for inmate calls with the New York Public Service Commission. These rates were approved on December 16, 1998. MCI also filed all interstate rates with the FCC, who also approved all relevant rates.

service provider of their choice, which they argue could yield a lower price for each call.  They

contend that the exclusive services contract violates both federal and state antitrust statutes.

Plaintiffs seek a declaratory judgment that the telephone system is illegal, a permanent injunction

disallowing the use of that system, and restitution and damages in the amount of ninety-three

million dollars, plus attorneys' fees.[5]

Defendant MCI moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  The state

defendants also moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

The court must decide a motion to dismiss under Rule 12(b)(6) accepting all allegations

in the complaint as true and drawing all reasonable inferences in the plaintiff's favor.  See

Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 89-90 (2d Cir. 2004).  In order to avoid

dismissal, a plaintiff must do more than plead mere "conclusory allegations or legal conclusions

masquerading as factual conclusions." Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333

(S.D.N.Y. 2000).  The point at which "conclusory allegations" become valid pleadings lies where

the plaintiff has asserted sufficient facts that, when construed liberally, allow the inference of a

violation.  See, e.g., Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001).  The court must not

dismiss, however, "unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of [her] claim that would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2

---

[5] In addition to the case before this Court, another group of plaintiffs, including many of
those in this case, filed a state action alleging the same constitutional claims under the New York
State Constitution.  The Court of Claims dismissed plaintiffs' complaint as untimely.  The
Appellate Division, Third Department, affirmed the lower court's findings and held, inter alia,
that the filed rate doctrine, *discussed infra*, barred plaintiffs' claims which arose directly from
their payment of the filed rate.  Bullard v. State of New York, 763 N.Y.S.2d 371 (N.Y. App. Div.
2003).

L. Ed. 2d 80, 78 S. Ct. 99 (1957).  This principle is to be applied "with particular strictness when the plaintiff complains of a civil rights violation." Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991).  "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" Leonard F. v. Israel Discount Bank, 199 F.3d 99, 107 (2d Cir. 1999) (quoting Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)).

## I.  Single Provider System Claims

Plaintiffs argue that the single provider system, where MCI is the exclusive telephone services provider to all DOCS prison facilities, implicates their right to contract under Article 1, § 10 of the United States Constitution, and violates Sections 1 and 2 of the Sherman Act.

A.  Contracts Clause

Plaintiffs challenge this single provider feature as a violation of their freedom to contract. It is alleged that "each of [the] [p]laintiffs and class members have an ongoing contract with a chosen telephone company for the provision of long distance telephone service.  Those contracts specify the services to be provided, the charges for different types of calls and the calling options."  Compl. ¶ 94.

Article I, Section 10, Cl. 1 of the U.S. Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." By its terms, the clause "is aimed at the legislative power of the State, and not at ... the acts of administrative or executive boards or officers." New Orleans Waterworks v. Louisiana Sugar Refining Co., 125 U.S. 18, 30 (1888). In other words, whether a statute violates the contracts clause "must be determined by examining

the statute itself and asking whether it breached or substantially impaired a contract or whether it required state officials to do so." Association of Surrogate's & Supreme Court Reporters v. New York, No. 92 Civ. 4004, 1995 WL 555777, at *2 (S.D.N.Y. Sept. 19, 1995).

To state a claim for violation of the Contracts Clause, a plaintiff must allege facts sufficient to demonstrate that a state law has "operated as a substantial impairment of a contractual relationship." General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)). There are three components to this inquiry: (1) "whether there is a contractual relationship"; (2) "whether a change in law impairs that contractual relationship"; and (3) "whether the impairment is substantial." Id. Even if a state law constitutes a substantial impairment, however, it will survive a Contracts Clause challenge if it serves "a significant and legitimate public purpose" and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983) (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22 (1977)).

Plaintiffs' contract clause claim has no merit as the Contract Clause is not intended to be used for the purpose alleged here.

> Historically, it is crystal clear that the Contract Clause was not intended to embody a broad constitutional policy of protecting all reliance interests grounded in private contracts. It was made part of the Constitution to remedy a particular social evil--the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts--and thus was intended to prohibit States from adopting "as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 256, 98 S.Ct. 2716, 2728, 57 L.Ed.2d 727 (1978)(Brennan, J. dissenting)(citing Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 439, 54 S. Ct. 231, 240, 78 L. Ed. 413 (1934)).

Although the Contracts Clause is no longer limited to 'debtor relief' cases, it "has been regarded as implicated by any measure which dilutes or nullifies a duty created by a contract." Id. (citing e.g., El Paso v. Simmons, 379 U.S. 497, 85 S. Ct. 577, 13 L. Ed. 2d 446 (1965)).

Moreover, a contract cannot be impaired by a law in effect at the time of the making of the contract, for that is the law which binds the contract. See Home Building & Loan Assn., 290 U.S. at 429-30, 54 S. Ct. 231. Plaintiffs, therefore, have not and cannot show that a change in law impaired their contractual relationship. In order to do so, they would have to allege that they had a contractual expectation that "in the event someone they knew might some day go to prison in [New York], they would be able to communicate with that individual by telephone in accordance with the rates and service options of their choice." McGuire v. Ameritech Services, Inc., 253 F. Supp. 2d 988, 1006 (S.D. Ohio 2003). Furthermore, as a practical matter, in most circumstances, including those alleged here, recipients of collect calls cannot necessarily select the carrier handling the call. Rather, the carrier is chosen either by that caller, by the owner of the payphone, or in this instance, DOCS, who runs the prison system. Plaintiffs' Contract Clause claim is therefore dismissed.

B. The Sherman Act

Plaintiffs also challenge the single provider system on the basis that it violates Sections 1 and 2 of the Sherman Act. Specifically, plaintiffs allege that the system constitutes a "combination and conspiracy to restrain trade in the overall market for inmate-initiated telephone service." Compl. § 102. Furthermore, in granting MCI the exclusive right to provide telephone service, it is alleged that the state defendants "have willfully and intentionally acquired, exercised, and maintained monopoly power in the markets for inmate-initiated telephone service

at [DOCS] facilities." Compl. § 110.

The Sherman Antitrust Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Act also makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

MCI's exclusive provision of telephone service to the entire New York State prison system arose from the public bidding process. MCI, along with other telephone service providers, responded to DOCS' request for proposals. This competitive bidding process resulted in an exclusive contract being awarded to MCI. The resulting contract outlines the services MCI is to provide to the state and the rates to be charged. Moreover, as discussed *infra*, these rates are set and filed with the FCC and the PSC. Under these circumstances, plaintiffs' Sherman Act challenges to the exclusive services contract are barred under the state action doctrine. Elucidated by the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed.315 (1943), the doctrine grants immunity from liability under the Sherman Act to any restraints imposed by a state in the exercise of its sovereign powers. Id. at 352. The Court found that the Sherman Act was not intended to restrain states from conducting their affairs as they see fit. Id. at 351.

Moreover, even if the state action effectively serves as a monopolistic restraint of trade, a Sherman Act violation will not be found if the restraint stems from a clearly articulated and affirmatively expressed state policy, that is actively supervised by the state itself. See California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S. Ct. 937, 63 L. Ed. 2d 233 (1980); see also Federal Trade Comm'n v. Ticor Title Ins. Co., 504 U.S. 621, 633 112

S. Ct. 2169, 2176-77, 1219 L. Ed.2d 410 (1992) (finding that a policy "may displace competition with active state supervision if the displacement is both intended by the [s]tate and implemented in its specific details."). Lastly, Parker immunity also extends to the private parties acting pursuant to and in conformity with the state policy. See Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 56-57, 105 S. Ct. 1721, 85 L. Ed. 2d 36 (1985).

This case is precisely the type for which Parker immunity must be extended. See McGuire, 253 F. Supp. 2d at 1009 (dismissing plaintiffs' antitrust claims because "the state action doctrine must apply with its greatest vigor in a case . . . where a state government has contracted with an outside vendor to provide a service on behalf of the state itself."). DOCS, as an agency of New York State, is charged with the administration of New York State's prison system. It is within DOCS' authority to award a government contract to an outside vendor. It is undisputed that the awarding of this contract was borne out of a public and competitive bidding process. Numerous bids were considered and there is no allegation that any provider who wanted to submit a competitive bid was not allowed to do so. The exclusive contract between New York and MCI, therefore, cannot be subject to Sherman Act scrutiny since it enjoys Parker immunity. "States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly of force that is the definition of government." Arsberry v. Illinois, 244 F.3d 558, 566 (7th Cir. 2001) (finding that the single provider system is similar to the "way that an airport will charge a fee to concessionaires eager to sell to the captive market . . . . The concessionaires will pass on much of the fee to their customers, who will thus pay a higher than competitive price."). "It would be pioneering indeed for a federal court to hold that Congress, in enacting the Sherman Act, intended to prohibit states from entering into exclusive services contracts necessary and efficient to their own operations." McGuire, 253 F. Supp. 2d at 1010.

Plaintiffs' Sherman Act claim is therefore dismissed.

    C.  <u>State Law Claims</u>

Plaintiffs further allege that defendants, through their imposition of the single provider collect call system, have tortiously interfered with their contractual relations with their individual telephone service providers. In order to state a claim for tortious interference with contract under New York law, a plaintiff must show that there existed a valid contract between the plaintiff and a third party, the defendant knew of the contract, and the defendants intentionally and unjustifiedly procured a breach, thereby causing damages. See <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996). Although plaintiffs have alleged that they have existing contracts with their individual phone companies, and that defendants were aware of these contracts, plaintiffs cannot show that defendants intentionally procured the breach of said contracts. Plaintiffs have insufficiently alleged how any actions by the defendants induced a breach of their existing contracts. Primarily, plaintiffs cannot sufficiently allege what breach occurred. The fact that use of their own individual phone service provider is not available in state prisons does not constitute a breach of contract. Having insufficiently alleged facts in support of their claim, plaintiffs' cause of action for tortious interference with contract is dismissed.

## II. **Collect-Call-Only System**

Plaintiffs also challenge the collect-call-only aspect of the telephone system, alleging that it "unlawfully burdens [their] rights of familial association by impeding communication with their spouses, children and relatives who are [DOCS] inmates concerning matters of health care, marriage, procreation, pregnancy, parenting and other critical family issues" in violation of the

First Amendment.[6]  Compl. ¶ 76.

The Supreme Court has held that a prison regulation impinging on inmates' constitutional

rights "is valid if it is reasonably related to legitimate penological interests." Turner v. Safley,

482 U.S.78, 89, 107 S. Ct., 2254, 2261, 96 L. Ed. 2d 64 (1987).  Such a deferential standard is

necessary, where:

> "'prison administrators ..., and not the courts, [are] to make the difficult judgments
> concerning institutional operations.' Subjecting the day-to-day judgments of prison
> officials to an inflexible strict scrutiny analysis would seriously hamper their ability to
> anticipate security problems and to adopt innovative solutions to the intractable problems
> of prison administration."

Id. (citation omitted) (quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S.

119, 128, 97 S. Ct. 2532, 2539, 53 L. Ed. 2d 629 (1977)).  Moreover, it is well settled in the

Second Circuit that "great deference" must be afforded to prison officials who are responsible for

maintaining order in prisons. Fromer v. Scully, 874 F.2d 69, 73 (2d Cir. 1989); Young v.

Coughlin, 866 F.2d 567, 570 (2d Cir. 1989).

Defendants argue that the rational basis standard set forth in Turner v. Safley applies and

that under this standard, plaintiffs' claim must be dismissed.  Plaintiffs argue, however, that this

standard should not apply.  They claim that because they are not inmates, they should not be

subjected to this deferential standard.  However, "[b]ecause inmates initiate the calls, the

recipients are necessarily constrained by whatever security measures are appropriate to place on

the inmates themselves." Deleure v. Kentucky, 119 F. Supp. 2d 683, 691 (W.D. Ky. 2000).

Since a prisoner's right to telephone access is "subject to rational limitations in the face of

---

[6] Plaintiffs do not allege that the content of their speech is restricted by the collect-call-only system.  Nor is there any allegation that their right to correspond by mail or their right to visit the inmates has been hampered by DOCS.

legitimate security interests of the penal institution," so too are the recipients. See Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986). "The connection between the inmates and the recipients of their calls cannot be severed . . . . If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients." Deleure, 119 F. Supp. 2d at 691. The collect-call-only system has a rational basis in the prison context. Courts have found that collect call telephone systems can help to avert fraud by inmates, block access to restricted telephone numbers of crime victims and prevent inmates from monopolizing available telephones. See Clark v. Plummer, 1995 WL 317015, * 1 (N.D. Cal. Jan. 9, 1995). Because of these types of concerns and risks, "[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." Fillmore v. Ordonez, 829 F.Supp. 1544, 1563-64 (D. Kan. 1993), aff'd, 17 F.3d 1436 (10th Cir. 1994). Accordingly, plaintiffs' constitutional challenge to the collect-call-only aspect of the telephone system is dismissed.

### III. Sixty Percent Commission

Plaintiffs finally allege that the sixty percent commission guaranteed by MCI to DOCS, pursuant to the exclusive agreement between the two parties, violates their constitutional rights under the First Amendment, and the equal protection and due process clauses of the Fourteenth Amendment.

A. Claims against MCI

MCI moved to dismiss on the basis that the filed rate doctrine precludes this Court from considering plaintiffs' claims.[7] The filed rate doctrine (also referred to as the filed tariff doctrine)

---

[7] Defendant MCI also argues that the primary jurisdiction doctrine warrants dismissal of plaintiffs' claims against them. The doctrine of primary jurisdiction bars a claim "involving a

is the central principle of the regulatory scheme for interstate telecommunications carriers.  The

doctrine is derived from the tariff-filing requirements of the Federal Communications Act, see 47

U.S.C. § 203(a) and "forbids a regulated entity to charge rates for its services other than those

properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co. v.

Hall, 453 U.S. 571, 577, 101 S. Ct. 2925, 2930, 69 L. Ed. 2d 856 (1981).  "Unless and until

suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and

[customer]. The rights as defined by the tariff cannot be varied or enlarged by either contract or

tort of the carrier." Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 163, 43 S. Ct. 47,

49, 67 L. Ed. 183 (1922); see also Louisville & Nashville R.R. Co. v. Maxwell, 237 U.S. 94, 97,

35 S. Ct. 494, 495, 59 L. Ed. 853 (1915).  Further, it has been held that under this rule the tariff

binds "both customers and carriers with the force of law." ICOM Holding, Inc. v. MCI

Worldcom, Inc., 238 F.3d 219, 221 (2d Cir. 2001) (quoting Lowden v.

Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S. Ct. 612, 83 L. Ed. 953 (1939)).

The filed rate doctrine is motivated by two principles (1) preventing carriers from engaging in

price discrimination between ratepayers and (2) preserving the exclusive role of federal agencies

in approving rates for telecommunications services that are "reasonable" by keeping courts out of

the rate-making process. Marcus v. Am. Tel. and Telegraph Corp., 138 F.3d 46, 58 (2d Cir.

1998).

---

regulated firm but not brought under the regulatory statute itself, [where] an issue arises that is
within the exclusive original jurisdiction of the regulatory agency to resolve."  Arsberry v.
Illinois, 244 F.3d 558, 563 (7th Cir. 2001). However, because the Court dismisses plaintiffs'
claims against MCI under the filed rate doctrine, it need not address MCI's arguments regarding
the primary jurisdiction doctrine.

Plaintiffs, however, emphasize that they do not seek to challenge the rates filed by MCI with the FCC. In a letter to the Court dated October 19, 2001, counsel for plaintiffs wrote "[t]ime and again, we have made clear that ours is not a case about rates. . . . Rather, this case is about the single provider/collect call-only system imposed by the Defendants *barring the bill payer recipients from using their chosen private provider*" (emphasis in original). Despite plaintiffs' contention, cloaking their rate challenge in constitutional cloth is insufficient to defeat the fact that plaintiffs' claims against MCI, at heart, question the reasonableness of the rates charged by MCI. See Daleure, 119 F. Supp. 2d at 689-90 (dismissing suit by recipients of inmate collect calls under the filed rate doctrine, finding that "[a]t bottom, [plaintiffs' complaint] is a rate discrimination claim"). Plaintiffs' constitutional claims against MCI are therefore dismissed.

### B. Claims against State Defendants

Plaintiffs also assert constitutional claims against the state defendants, arguing that DOCS' contract requirement, and its receipt and retention of the sixty percent commission violates their rights. Unlike their claims against MCI, plaintiffs' claims against the state defendants concerning the sixty percent commission are not simply a challenge to the rates. They cannot be, for the rates are set by MCI, not by DOCS. Rather, plaintiffs' claims against the state defendants challenge the sixty percent commission that DOCS receives from MCI, which artificially inflates the rate in a manner unrelated to the service provided. These claims, therefore, are not properly dismissed under the filed rate doctrine as "[s]uch an attack does not seek to invalidate any tariff, but merely to create an environment in which the regulated firm is more likely to file a tariff that contains terms more favorable to customers." Arsberry, 244 F.3d at 563.

Similarly, plaintiffs' First Amendment challenge to the state defendants' receipt of a sixty

percent commission should not be dismissed at this stage of the proceedings. "Inmates do not

lose all First Amendment protections once they enter the prison gates, and as Plaintiffs point out

prisoners are entitled to reasonable telephone access." McGuire, 253 F. Supp. 2d at 1002 (citing

Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994)). Moreover, non-inmates lose none of

their First Amendment protections. Here, plaintiffs complain that they are charged unreasonable,

excessive, and prohibitive charges over and above MCI's regular rates, namely through the sixty

percent commission DOCS receives.[8] This Court must accept the facts as pled for purposes of

ruling on defendants' motion to dismiss. At this stage in the litigation, the Court cannot

conclude that there is "no set of facts" upon which relief under the First Amendment might be

granted. "For example, if Plaintiffs could show that the costs are so exorbitant that they are

unable to communicate...then relief might be warranted."[9] Id. Unlike the collect-call-only

---

[8] Plaintiff Mary Byrd, a seventy-nine-year-old woman, suffers from severe chronic lung disease and is therefore unable to visit her two sons who have been incarcerated since 1983. The only way she can speak with them is by accepting their collect calls. Compl. ¶ 8. Because of the high cost of these calls, "Ms. Byrd has at times been unable to pay her telephone bills when they became due. When the telephone company received one payment late, it cut off her long distance. Ms. Byrd now receives calls from her sons through her sister's account, makes installment payments on her past bills and struggles to pay the $150 per month that she is currently billed...As a result, Ms. Byrd and her sons...have not been able to keep in close contact." Compl. ¶ 43.
Similarly, plaintiff Wanda B., a full-time college student who provides financial assistance to both her daughter and her two young grandchildren while subsisting on a low salary, has telephone bills which average $300 to $350 per month due to the collect calls placed by her incarcerated husband. Compl. ¶ 42.

[9] Plaintiff Cora W. is homebound and unable to travel to visit her incarcerated son due to her "severe arthritis and the chronic effects of a brain aneurysm." "Moreover...[she] often cannot grip a pen to write to her son. Thus, she is only able to communicate with [him] by accepting his collect calls." By limiting the duration of his calls, Cora W. keeps her phone bills down to $70 to $80 per month - however her sole source of income is the $563 per month she receives from

aspect, the sixty percent commission charge has no obvious penological interest. State

defendants' motion to dismiss plaintiffs' First Amendment claim involving the sixty percent

commission aspect of the telephone system is therefore denied.

Plaintiffs also allege that defendants' operation of the current telephone system violates

their due process rights by "imposing regulatory fees for telephone services and prohibiting less

costly alternatives for inmate calls," thereby constituting "a confiscation...of property"[10] violative

of the Fourteenth Amendment. Compl. ¶ 78. In order to establish that a due process violation

has occurred, the plaintiffs must show that they had a property or liberty interest as contemplated

by the Fourteenth Amendment and that they were deprived of such interest in a manner

inconsistent with the safeguards of the Fourteenth Amendment. See Board of Regents v. Roth,

408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (stating that "[w]hen protected

interests are implicated, the right to some kind of prior hearing is paramount" before the state can

deprive one of said interest). Protected property interests are defined under state law. Id. at 576-

78. Here, plaintiffs' allege that the sixty percent commission illegally deprives them of their

money (Compl. ¶ 78) - a well recognized property interest. See, e.g., McGuire, 253 F. Supp. 2d

at 1004. However, "[t]he prospective recipient of a collect call is in complete control over

whether she chooses to accept the call and thereby relinquish her money to pay for it. There is no

taking of which to speak, such as where the government confiscates property or forecloses its

_____

Social Security and Disability benefits. "Frequently, she must forego purchasing needed
medication so that she can pay her telephone bill and keep in contact with [her son]." Compl. ¶
46.

[10] In their opposition to defendants' motion, plaintiffs allege that the sixty percent
commission constitutes a "taking of private property for public use without just compensation" in
violation of the Fifth Amendment. The Court will not address this argument here as it was not
properly pled in plaintiffs' complaint; and will therefore address this claim only as it relates to
plaintiffs' Fourteenth Amendment due process claim.

commercial use by fiat or legislation, and any argument that the State has created a property interest in free or cheap collect calls would not be well taken." Id. (dismissing plaintiffs' procedural due process claim because defendants "did not take their money in a constitutionally infirm way").

Rather than stating a due process claim with a procedural dimension (i.e. that they have been denied their right to challenge the additional telephone charges), plaintiffs' due process claim is more appropriately construed as substantive. Plaintiffs allege that the telephone system "unlawfully burdens [their] rights of familial association by impeding communication with their spouses, children and relatives who are [DOCS] inmates concerning matters of health care, marriage, procreation, pregnancy, parenting and other critical family issues.[11] As a result, [d]efendants' actions, policies and practices violate [p]laintiffs' due process rights under the First and the Fourteenth Amendments." Compl. ¶ 76-77. This right to intimate association with

---

[11] Plaintiff Mary M. who is disabled and subsists on "a limited disability income through the Social Security system" of $535 has two sons who are incarcerated. Her health problems prevent her from visiting her sons and therefore she can only speak to them by accepting their collect calls, which cost an average of $200 to $250 per month. Compl. ¶ 9, 43. In 1996, her grandson whom she cared for fell out of a window. "He was hospitalized for a long time, battling for his life. During this crisis, [the boy's incarcerated father] called home frequently. Because [she] could not pay the additional expense of these calls, her telephone service was terminated approximately six times." Compl. ¶ 43.

Plaintiff Carole B. has been prevented from visiting her incarcerated husband due to "certain medical risks in her pregnancy," so she must accept his collect calls in order to speak with her husband. Compl. ¶ 10. She tries to speak to her husband "as frequently as possible so that they can make important family decisions together." Compl. ¶ 45. Phone communication is important since "[l]etter writing is neither a reliable nor expeditious means of communication." With an annual income of only $20-25,000, her monthly phone bills of $400 to $500 are a "strain to manage" since "she must [also] cover all living and healthcare expenses." Compl. ¶ 45.

Plaintiff Alison C. is faced with a similar dilemma since she is ill with cancer and her husband is incarcerated. They too need to communicate "on an urgent basis so that they can make important family decisions together...[which require] an immediate exchange of information." With an annual income of just $14,000, her $70 to $80 monthly phone bills are a "burden" since "she must [also] cover all living and health care expenses." Compl. ¶ 47.

family members "stems from both the First Amendment's right of association, and the

substantive due process protections of the Fourteenth Amendment." Lee v. State of New York

Dep't of Correctional Services, 1999 U.S. DIST. LEXIS 13214 (S.D.N.Y. 1999). At this stage in

the litigation, the Court cannot conclude that there is "no set of facts" upon which relief under the

Due Process Clause might be granted. State defendants' motion to dismiss plaintiffs' due

process claims involving the sixty percent commission aspect of the telephone system is

therefore denied.

Plaintiffs further assert that the sixty percent commission violates their equal protection

rights under the Fourteenth Amendment. State defendants contend that the standard set forth in

the Supreme Court's decision in Turner v. Safley also governs this Court's analysis of plaintiffs'

equal protection challenge to the sixty percent commission. Although under Turner, prison

regulations are upheld, despite their infringing character, if they are "reasonably related to

legitimate penological interests." 482 U.S. at 89, the sixty percent commission here is not such a

prison regulation. It does not involve matters of security or safety, which have traditionally been

held to the Turner standard. Receiving an alleged "kickback" from an additional fee added to the

reasonable rate for collect calls[12], made by inmates to family members and those individuals

providing counseling and professional services, is neither a rule nor regulation related to the

functioning of a prison.[13] Courts that have analyzed similar equal protection claims have found

---

[12] Indeed, "[f]or the purposes of this motion defendants *admit the possibility*"of
plaintiffs' allegations that DOCS could have forgone these commissions and induced the phone
company to establish a lower fee for the collect calls, "thus passing the 'savings' on to the
prisoners' families." They contend, however, that this possibility does not mean that their
decision to instead guarantee the receipt of the sixty percent commission constitutes the
imposition of an unconstitutional "fee" or "tax." Reply Memorandum of Law In Further Support
of State Defendants' Motion to Dismiss at 11 (citation omitted) (emphasis added).

[13] The originally stated purpose of this commission was to fund a legislatively established
family benefit program. However, the state defendants' refer to the commission as "providing

that plaintiffs' position is inextricably tied to their relationship to the inmate, and as such, plaintiffs are subject to the standard applicable to inmates.[14] However, the state defendants have offered no rational basis to justify placing the burden of this additional commission solely on the friends and families of inmates, and those individuals providing counseling and professional services, thereby charging them more per call than similarly situated collect call recipients.[15] Accordingly, the state defendants' motion to dismiss plaintiffs' equal protection claims is denied.

## CONCLUSION

State defendants' motion to dismiss plaintiffs' claims challenging the exclusive services contract between the state and MCI is granted. State defendants' motion to dismiss plaintiffs' claims challenging the collect-call-only system is granted. The state defendants' motion to

---

funds which *could* be used for inmate services." Reply Memorandum of Law In Further Support of State Defendants' Motion to Dismiss at 10 (emphasis added).

[14] "The connection between the inmates and the recipients of their calls cannot be severed. It is the relationship to inmates alone that defines the group. If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients. Thus, the real question is whether inmates and non-inmates are similarly situated. This court finds that they are not . . . . Because the recipients of inmate calls are not similarly situated with the recipients of non-inmate calls, [p]laintiffs would have to allege they were discriminated against as compared to other recipients of inmate calls to state a supportable claim." Daleure, 119 F. Supp. 2d at 691; see also Gilmore v. County of Douglas, 406 F.3d 935, 938 (8th Cir. 2005).

[15] As a minister for her church, plaintiff Norma B. serves as a spiritual counselor to inmates and their families. "To the extent that she is financially able to do so, as part of her ministry, [she] accepts calls from inmates and passes on information to their loved ones, who often cannot afford to receive the collect calls directly." Compl. ¶ 48. She "frequently cannot...provide the counseling and contact services that she usually provides" given the high cost of the collect calls. In addition, these prohibitive costs also often prevent her from speaking with her husband, who is incarcerated. Compl. ¶ 48.
Plaintiff Elizabeth F., who is the Director and Lead Counsel for the Attica Brothers Legal Defense Fund, accepts collect calls from her incarcerated clients in order to effectively communicate with them. Compl. ¶ 17. She is thus forced to pay the high cost of the collect calls from her incarcerated clients so that she can represent them as effectively as her non-incarcerated clients.

dismiss plaintiffs' claims challenging the sixty percent commission is denied. Defendant MCI's

motion to dismiss is granted in its entirety.

Dated: August 26, 2005
        New York, New York               SO ORDERED:

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge